1
2
3
4

UNITED STATES DISTRICT COURT

5

DISTRICT OF NEVADA

6

* * *

7

UNITED STATES OF AMERICA,

8

Plaintiff,

9

v.

10

BENJAMIN GALECKI,

11

Defendant.

Case No. 2:15-cr-00285-APG-PAL

**ORDER**
*- AND -*
**REPORT OF FINDINGS AND
RECOMMENDATION**

(Mot. to Dismiss – ECF No. 171;
Mots. Joinder – ECF Nos. 162, 163, 173, 177)

12    This matter is before the court on Defendant Benjamin Galecki's Omnibus Motion to

13 Dismiss (ECF No. 171). This Motion is referred to the undersigned for a report of findings and

14 recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 of the Local Rules of

15 Practice. The court has considered the Motion, the Government's Response (ECF No. 193), and

16 Ritchie's Reply (ECF No. 201), as well as co-defendants Charles Burton Ritchie and Ryan

17 Matthew Eaton's Motions for Joinder (ECF Nos. 162, 163, 173, 177).

18    **BACKGROUND**

19 **I.  THE INDICTMENTS**

20    This case involves the government's allegations that Galecki and his co-defendants

21 manufactured and distributed controlled substances and controlled substance analogues

22 ("analogues"),[1] committed mail and wire fraud, and engaged in illegal financial transactions with

23 the proceeds from their drug operations. Ritchie and Galecki were business partners in the entity

24 Zencense Incense Works, LLC ("Zencense"). Supers'g Indict. (ECF No. 56) ¶ 1. Defendants

25 manufactured and distributed products falsely labeled as "herbal incense," "potpourri," or

26 "aromatherapy," but not as spice. *Id.* ¶¶ 3, 5. Zencense's spice products contained the analogues

---

[1] In this case, the alleged analogues are "smokable synthetic cannabinoid products" referred to as "spice." Supers'g Indict. (ECF No. 56) at 3, ¶ 2.

and controlled substances XLR-11 a/k/a 5F-UR-144 ("XLR-11") and AM2201, referred to as "additive." *Id.* ¶¶ 3, 10.  The defendants "either (a) knew that these analogues were regulated as controlled substances, or (b) knew the specific features of each analogue that make it a controlled substance analogue," and they intended the analogues for human consumption. *Id.* ¶ 3.

Eaton was employed by Zencense no later than February 2012. *Id.* ¶ 1.  In May 2012, Ritchie leased a warehouse in Las Vegas, and Eaton relocated to Las Vegas to begin manufacturing spice at the warehouse. *Id.* ¶¶ 6–7.  Between on or about May 28, 2012, and July 25, 2012, the defendants manufactured and caused to be manufactured up to 200 kilograms of spice per week in the Las Vegas warehouse. *Id.* ¶ 12.  During that time, Eaton mailed the spice to Zencense's office in Pensacola, Florida. *Id.* ¶ 13.  Galecki and Ritchie also communicated by text messages and emails with Eaton regarding the supply and operation of the warehouse and the "batches" of product Eaton made. *Id.* ¶ 9.  Between May and August 2012, Ritchie and Galecki deposited at least $1.5 million in proceeds of Zencense's spice operations into a business bank account and then withdrew and transferred more than $830,000 from that account. *Id.* ¶¶ 14–15.

A federal grand jury sitting in Las Vegas, Nevada, initially returned an Indictment (ECF No. 1) on October 13, 2015, charging Galecki and Ritchie with eight counts.  A Superseding Indictment (ECF No. 56) was returned August 24, 2016, charging Galecki and Ritchie with 26 counts and four corresponding forfeiture allegations, and adding Eaton as a defendant in six counts and two forfeiture allegations:

- Count One – Continuing criminal enterprise in violation of 21 U.S.C. § 848.
- Count Two – Conspiracy to engage in financial transactions to promote unlawful activity in violation of 18 U.S.C. § 1956(h).
- Count Three – Conspiracy to transport funds to promote unlawful activity in violation of 18 U.S.C. § 1956(h).
- Counts Four to Seven – Transporting funds to promote unlawful activity in violation of 18 U.S.C. § 1956(a)(2)(A) and 18 U.S.C. § 2.
- Count Eight – Conspiracy to launder money instruments in violation of 18 U.S.C. § 1956(h).
- Count Nine – Conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349.
- Counts Ten to Thirteen – Mail fraud in violation of 18 U.S.C. § 1341 and § 2.

- Count Fourteen – Conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.
- Counts Fifteen to Nineteen – Wire fraud in violation of 18 U.S.C. § 1343 and § 2.
- Count Twenty – Conspiracy to manufacture, possess with intent to distribute, and distribute a controlled substance and a controlled substance analogue to the extent intended for human consumption in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846.
- Count Twenty-One – Possession with intent to distribute a controlled substance and a controlled substance analog to the extent intended for human consumption in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2.
- Count Twenty-Two – Conspiracy to manufacture, possess with intent to distribute, and distribute a controlled substance analogue intended for human consumption in violation of 21 U.S.C. §§ 802(32)(A), 813, 841(a)(1), 841(b)(1)(C) and 846.
- Count Twenty-Three – Manufacture a controlled substance analogue to the extent intended for human consumption in violation of 21 U.S.C. §§ 802(32)(A), 813, 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.
- Count Twenty-Four – Distribution of a controlled substance analogue in violation of 21 U.S.C. §§ 802(32)(A), 813, 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.
- Count Twenty-Five – Maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2.
- Count Twenty-Six – Possession of a listed chemical with the intent to manufacture a controlled substance analogue intended for human consumption in violation of 21 U.S.C. § 841(c) and 18 U.S.C. § 2.

Summarized broadly, Count One of the Superseding Indictment alleges a continuing criminal enterprise, Counts Two through Eight involve allegations of illegal financial transactions, Counts Nine through Nineteen allege mail and wire fraud, and Counts Twenty through Twenty-Six are charges involving allegations the defendants conspired to and engaged in possession with intent to distribute, maintenance of a drug involved premise, and manufacturing and distribution of controlled substances and their analogues. The trial in this case is currently set for October 29, 2018, with calendar call on October 23, 2018. Order (ECF No. 174).

**A. Eastern District of Virginia**

Shortly before the original indictment was filed in the District of Nevada, Ritchie and Galecki were charged in the Eastern District of Virginia on September 8, 2015. *United States v. Ritchie, et al.*, Case No. 4:15-cr-0018-RAJ-LRL (E.D. Va.). A third superseding indictment ("Virginia Indictment") was returned August 9, 2016, charging them with eight counts of (i) conspiracy to distribute controlled substance analogues in violation of 21 U.S.C. §§ 846 and

3

813; (ii) distribution of controlled substance analogues in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); (iii) use of a facility in interstate commerce with intent to promote unlawful activity in violation of 18 U.S.C. § 1952(a)(3); and (iv) unlawful usage of a communication facility in violation of 21 U.S.C. § 843(b). Mot. Ex. 11 (ECF No. 171-11), E.D. Va. Indict. These charges arise from conduct that allegedly occurred between August 2012 and April 2013 only. The Virginia Indictment alleges that Galecki and Ritchie's spice products contained the analogues UR-144, XLR-11/5-FUR-144, AB-FUBINACA, AB-CHMINACA, and AB-PINACA.

In January 2017, a jury found Galecki and Ritchie guilty on all counts. However, the United States Court of Appeals for the Fourth Circuit recently vacated the convictions and remanded for further proceedings. *United States v. Ritchie*, No. 17-4357, 2018 WL 2383017 (4th Cir. May 25, 2018).[2]

**B. Southern District of Alabama**

Galecki and Ritchie are also charged in the Southern District of Alabama. *United States v. Ritchie, et al.*, Case No. 1:15-cr-00227-WS-C (S.D. Ala.). On August 9, 2016, a federal grand jury returned an indictment charging Galecki and Ritchie with (i) attempt and conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349; (ii) conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h); (iii) conspiracy to introduce, receive, deliver, and sell misbranded drugs in violation of 18 U.S.C. § 371; and (iv) conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Mot. Ex. 9 (ECF No. 171-9), S.D. Ala. Indict. These charges arise from conduct that allegedly occurred between August 1, 2012, through April 11, 2013. The Alabama indictment alleges that Galecki and Ritchie's spice products contained the analogues XLR11 or 5FUR-144. The Alabama case is currently set for trial in September 2018.

## DISCUSSION

**I.  RITCHIE AND EATON'S MOTIONS FOR JOINDER (ECF NOS. 162, 163, 173, 177)**

Defendants Ritchie and Eaton seek permission to join in the substantive arguments Mr. Galecki

---

[2]  The Fourth Circuit held that the district court erred in finding that the deliberative process privilege precluded the testimony of Dr. Arthur Berrier, a senior research chemist with the Drug Enforcement Agency's (DEA) Office of Forensic Sciences. *Id.* at *3. The Fourth Circuit left the materiality and admissibility of Dr. Berrier's testimony for the district court to consider in the first instance and noted that further proceedings would potentially include a new trial. *Id.*

advances in the current motion.  Ritchie and Eaton filed two of their joinder motions (ECF Nos. 162, 163) before the court entered an Order (ECF No. 170) striking Galecki's Motion to Dismiss (ECF No. 160) from the docket based on counsel's failure to comply with the District of Nevada's established page limits.  The court allowed counsel three days to refile a motion complying with the page limits set forth in the Local Rules of Criminal Practice.  Mr. Galecki timely filed the current motion, and Ritchie and Eaton filed two additional joinder motions (ECF Nos. 173, 177).  Accordingly, the court will deny as moot Ritchie and Eaton's initial motions and grant their subsequent motions, allowing them to join in Galecki's substantive arguments for dismissal of the Superseding Indictment.

## II.  GALECKI'S MOTION TO DISMISS

### A.  Applicable Legal Standards

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment be a "plain, concise and definite written statement of the essential facts constituting the offense charged."[3]  An indictment is constitutionally sufficient if it (1) contains the essential elements of the charged offense and fairly informs the accused of the charges to be defended against, and (2) enables the accused to plead an acquittal or conviction as a bar against double jeopardy for any subsequent prosecution.  *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  "An indictment which tracks the words of the statute charging the offense is sufficient so long as the words unambiguously set forth all elements necessary to constitute the offense." *United States v. Givens*, 767 F.2d 574, 584 (9th Cir. 1985) (citing *Hamling*, 418 U.S. at 117); *Resendiz-Ponce*, 549 U.S. at 109 (noting that "an indictment parroting the language of a federal criminal statute is often sufficient").  This means an indictment can be sufficient despite conclusory legal allegations.  *See id.*  "The test of sufficiency of the indictment is not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.  *United States v. Hinton*, 222 F.3d 664, 672 (9th Cir. 2000) (citing *United States v. Rosi*, 27 F.3d 409, 415 (9th Cir. 1994)).

Pursuant to Rule 12, a "party may raise by pretrial motion any defense, objection, or request

---

[3]  All references to a "Rule" or the "Rules" in this order refer to the Federal Rules of Criminal Procedure.

that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).  Rule 12(b)(3) specifies the motions which must be made before trial.  Among them is a motion to dismiss for failure to state an offense.  Fed. R. Crim. P. 12(b)(3)(v).  "A motion to dismiss is generally capable of determination before trial if it involves questions of law rather than fact" *United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017) (quotation omitted).

In ruling on a pretrial motion to dismiss, "the district court is bound by the four corners of the indictment." *United States v. Lyle*, 742 F.3d 434, 436 (9th Cir. 2014); *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).  The court "cannot consider evidence that does not appear on the face of the indictment." *Kelly*, 874 F.3d at 1046 (citing *Lyle*, 742 F.3d at 436; *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996)).  Accordingly, a defendant is not entitled to a pretrial evidentiary hearing to obtain a preview of the government's evidence and an opportunity to cross-examine its witnesses. *Jensen*, 93 F.3d at 669 ("A motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence.").

In determining whether a cognizable offense has been charged, the court does not consider whether the government can *prove* its case, only whether accepting the facts as alleged in the indictment as true, a crime has been alleged. *United States v. Milovanovic*, 678 F.3d 713, 717 (9th Cir. 2012).  Rule 12 motions cannot be used to determine "general issues of guilt or innocence," which "helps ensure that the respective provinces of the judge and jury are respected." *Boren*, 278 F.3d at 914 (citation omitted).  A defendant may not challenge a facially-sufficient indictment on the ground that the allegations are not supported by adequate evidence. *Jensen*, 93 F.3d at 669 (citation omitted).  However, the court may dismiss an indictment if "it fails to recite an essential element of the charged offense." *United States v. Ezeta*, 752 F.3d 1182, 1184 (9th Cir. 2014) (citing *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005)).

### B.  Analysis and Decision

#### 1.  Ground One – Double Jeopardy

With respect to ground one, Galecki's motion asserts that Counts Twenty through Twenty-Six (at a minimum, Counts Twenty and Twenty-Two) must be dismissed because the defendants are charged in Virginia, Alabama, and Nevada with what amounts to the same overarching

1    conspiracy.  Mot. at 14–25.  Because defendants were convicted in Virginia, Galecki's double

2    jeopardy rights will be violated by the Nevada prosecution.[4]  Galecki acknowledges that his co-

3    defendant, Mr. Ritchie filed a Motion to Dismiss (ECF No. 111) advancing virtually identical

4    arguments, and the undersigned entered a Report of Findings and Recommendation (ECF No. 116)

5    ("R & R") finding that the Nevada charges do not violate double jeopardy.[5]

6        The government's April 27, 2018 Response argues that Galecki's motion attempts to

7    relitigate claims the undersigned already rejected in the R & R.

8        On May 3, 2018, the Honorable Andrew P. Gordon, United States District Judge, accepted

9    and adopted the R & R.  Order (ECF No. 196).  After conducting a de novo review of the motion,

10   R & R, and related papers, Judge Gordon held that the R & R "sets forth the proper legal analysis

11   and factual basis for the decision" and denied Ritchie's motion.  *Id.*

12       Mr. Galecki filed his Reply (ECF No. 201) on May 15, 2018, acknowledging Judge

13   Gordon's ruling on the R & R.  Defense counsel notes that Galecki was represented by different

14   counsel at the time Ritchie's motion was litigated and asks the court to reconsider its ruling.

15       Although not expressly authorized by the Federal Rules of Criminal Procedure, motions

16   for reconsideration may be filed in criminal cases.  *United States v. Lopez-Cruz*, 730 F.3d 803, 811

17   (9th Cir. 2013) ("No precise 'rule' governs the district court's inherent power to grant or deny a

18   motion to reconsider a prior ruling in a criminal proceeding. Rather, the district court's authority

19   to revisit a ruling on a suppression motion 'is within its sound judicial discretion'.") (quoting

20   *United States v. Raddatz*, 447 U.S. 667, 678 n.6 (1980)).  Courts typically evaluate these motions

21   under the standards applied to civil motions for reconsideration.  *United States v. Hector*, 368 F.

22   Supp. 2d 1060, 1063 (C.D. Cal. 2005), *rev'd on other grounds*, 474 F.3d 1150 (9th Cir. 2007).

23   Reconsideration may be appropriate "if the district court (1) is presented with newly discovered

24   evidence; (2) committed clear error or the initial decision was manifestly unjust; or (3) if there is

25   an intervening change in controlling law."  *Frasure v. United States*, 256 F. Supp. 2d 1180, 1183

26

27   [4]  As explained, the Fourth Circuit recently vacated Galecki and Ritchie's convictions in Virginia and remanded for further proceedings.  Galecki filed his motion prior to the Fourth Circuit issuing its decision.

28   [5]  Mr. Galecki did not request to join in Ritchie's substantive arguments.  Thus, the court's R & R addressed Mr. Ritchie individually.

1   (D. Nev. 2004) (quoting *School Dist. No. 1J, Mutlnomah County v. ACandS, Inc.*, 5 F.3d 1255,

2   1263 (9th Cir. 1993)); *see also* LR 59-1.  "A motion for reconsideration is not an avenue to re-

3   litigate the same issues and arguments upon which the court already has ruled."  *W. Shoshone Nat.*

4   *Council v. United States*, 408 F. Supp. 2d 1040, 1053 (D. Nev. 2005).

5        Here, the court declines to reconsider its findings or recommendation in the R & R (ECF

6   No. 116).  Although Mr. Galecki did not timely join in the substance of Ritchie's underlying

7   motion, defense counsel acknowledges that Galecki's double jeopardy arguments are the same as

8   those raised by his co-defendant.  Galecki also incorporated by reference as though fully set forth

9   in his briefing Ritchie's underlying motion and objection to the R & R.  Mot (ECF No. 171) at 3

10  n.1.  The court gave thorough consideration to its prior R & R, and Judge Gordon has now affirmed

11  the R & R finding it set forth "the proper legal analysis and factual basis for the decision."  Order

12  (ECF No. 196).  Galecki's motion does not provide a meritorious reason to reconsider the

13  undersigned's prior decision.  His request for reconsideration is therefore denied.

14            2.  Ground Two – Unconstitutional Application of the Analogue Act

15       Ground two of Galecki's motion argues that dismissal is warranted based on the

16  government's unconstitutional application of the Controlled Substance Analogue Enforcement Act

17  of 1986 ("Analogue Act"), 21 U.S.C. §§ 802(32), 813.  Mot. at 26–36.  To address his arguments,

18  a brief overview of the applicable statutes is necessary.

19       Congress enacted the Controlled Substance Act ("CSA"), 21 U.S.C. §§ 801–971, as part

20  of the Comprehensive Drug Abuse Prevention and Control Act of 1970.  *Kelly*, 874 F.3d at 1042.

21  The CSA "restricts the illegal trafficking of various substances found to pose a danger to the health

22  and general welfare of the nation."  *Id.*  The CSA regulates or prohibits the manufacture,

23  possession, and distribution of controlled substances, and uses five categories or "schedules" to

24  classify controlled substances.  *Touby v. United States*, 500 U.S. 160, 162 (1991).  A "controlled

25  substance" is "a drug or other substance" listed in Schedule I, II, III, IV, or V.  21 U.S.C. § 802(6).

26  Schedule I substances pose the most serious threat to public safety.  *Touby*, 500 U.S. at 162.  Thus,

27  violations involving Schedule I substances carry the most severe penalties.  *Id.*

28  / / /

The CSA authorizes the Attorney General to add or remove substances, or to move a substance from one schedule to another. 21 U.S.C. § 811(a). The Attorney General has delegated this authority to the DEA. *Kelly*, 874 F.3d at 1042 (citing 28 C.F.R. § 0.100(b)). The DEA is required to follow specific procedures to add a substance to a schedule. *Id.* (quoting *Touby*, 500 U.S. at 162). A substance may be added to a schedule either permanently or temporarily under different procedures. *Id.* at 1042–43. To permanently schedule a substance, the DEA must complete numerous procedural requirements such as: (i) obtaining a scientific and medical evaluation of the drug from the Secretary of Health and Human Services (the "Secretary") and a recommendation from the Secretary that the substance should be controlled, § 811(b); (ii) considering eight statutory factors and make findings, § 811(c);[6] (iii) complying with the formal rulemaking provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 556–57, § 811(a); and (iv) issuing a final rule adding the substance to 21 C.F.R. § 1308.11, which contains the current list of Schedule I substances. *Kelly*, 874 F.3d at 1042–43. This rigorous process often extends from six to twelve months. *Id.* at 1043 (citing *Touby*, 500 U.S. at 163).

The lag time between when the DEA identifies a dangerous new drug until it is permanently scheduled produces "predictable results." *Id.* at 1043. In *Touby*, the Supreme Court recognized that drug traffickers have exploited the lengthy delays by "designing drugs that were similar in pharmacological effect to scheduled substances but differed slightly in chemical composition, so that existing schedules did not apply to them." 500 U.S. at 163. So-called " 'designer drugs' were developed and widely marketed long before the Government was able to schedule them and initiate prosecutions." *Id.* To fight this problem and reduce the regulatory delay, "Congress amended the CSA in 1984 to create an expedited procedure by which the DEA can temporarily schedule a new drug 30 days after identification if doing so is 'necessary to avoid an imminent hazard to the public

---

[6] The CSA requires consideration of eight factors with respect to the permanent scheduling of a drug: (1) Its actual or relative potential for abuse. (2) Scientific evidence of its pharmacological effect, if known. (3) The state of current scientific knowledge regarding the drug or other substance. (4) Its history and current pattern of abuse. (5) The scope, duration, and significance of abuse. (6) What, if any, risk there is to the public health. (7) Its psychic or physiological dependence liability. (8) Whether the substance is an immediate precursor of a substance already controlled under this subchapter. 21 U.S.C. § 811(c).

9

1    safety'."[7] *Kelly*, 874 F.3d at 1043 (quoting 21 U.S.C. § 811(h)(1)); *Touby*, 500 U.S. at 163.

2    "Temporary scheduling under § 811(h) allows the DEA 'to bypass, for a limited time,

3    several of the requirements for permanent scheduling'." *Kelly*, 874 F.3d at 1043 (quoting *Touby*,

4    500 U.S. at 163). The omitted requirements include the APA's formal rulemaking provisions,

5    obtaining the Secretary's prior approval, and considering five statutory factors. *Id*. However, the

6    DEA may only place a temporarily scheduled substance into Schedule I, and only if the Secretary

7    has not approved the drug for sale or exempted it for research under the Food, Drug, and Cosmetic

8    Act ("FDCA"), 21 U.S.C. § 355. *Kelly*, 874 F.3d at 1043. With regard to notice, the DEA is only

9    required to provide "30-days' notice of the proposed temporary scheduling in the Federal

10   Register," and the DEA then issues "a final order adding the drug to 21 C.F.R. § 1308.11(h)." *Id*.

11   (citing 21 U.S.C. § 811(h)(1)). "The temporary scheduling order remains valid for two years,

12   during which time the DEA presumably will initiate permanent scheduling proceedings, in which

13   case the order may be extended for an additional year." *Id*. at 1043–44 (citing 21 U.S.C.

14   § 811(h)(2)).

15   In 1986, Congress recognized the additional problem of drug traffickers seeking to avoid

16   criminal liability under the CSA by manufacturing or distributing substances that are not listed as

17   controlled substances but are purposely designed to have substantially similar effects to that of

18   listed substances. *See* 188 A.L.R. Fed. 325 (2003). The Analogue Act was passed to help combat

19   this problem. *Id*.; *United States v. Klecker*, 228 F. Supp. 2d 720, 726 (E.D. Va. 2002) (the purpose

20   of the Analogue Act is "to prevent development of new drugs by underground chemists attempting

21   to create new drugs that are not scheduled"), *aff'd*, 348 F.3d 69 (4th Cir. 2003). The Analogue

22

23   [7] To find that a substance presents an imminent hazard to public safety justifying temporary scheduling,

24   the DEA must consider only three of the eight factors required for permanent scheduling:
     (1) the drug's history and current pattern of abuse; (2) the scope, duration, and significance

25   of the abuse; and (3) what, if any, risk it poses to the public health. § 811(c)(4)–(6), (h)(3).
     In considering these factors, the DEA must consider the drug's "actual abuse, diversion

26   from legitimate channels, and clandestine importation, manufacture, or distribution."
     § 811(h)(3). In addition, the DEA must find that it has a high potential for abuse, no

27   currently accepted medical use in treatment, and no accepted safe use under medical
     supervision. § 812(b)(1).

28   *Kelly*, 874 F.3d at 1043.

Act "identifies a category of substances substantially similar to those listed on the federal controlled substance schedules, 21 U.S.C. § 802(32)(A), and then instructs courts to treat those analogues, if intended for human consumption, as controlled substances listed on schedule I for purposes of federal law, § 813." *McFadden v. United States*, 135 S. Ct. 2298, 2302 (2015).  The CSA "in turn makes it unlawful knowingly to manufacture, distribute, or possess with intent to distribute controlled substances." *Id.* (citing 21 U.S.C. § 841(a)(1)).  The CSA's knowledge requirement can be established in two ways, by evidence that the defendant: (1) "knew the substance with which he was dealing is some controlled substance—that is, one actually listed on the federal drug schedules or treated as such by operation of the Analogue Act—regardless of whether he knew the particular identity of the substance;" or (2) "knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue." *Id.* at 2305.

> The Analogue Act defines a "controlled substance analogue" as a substance:
>
> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
>
> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
>
> (iii) with respect to a particular person, which person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A).  Among the four narrow exclusions for the term "analogue" is a "controlled substance." *Id.* § 802(32)(C).  Thus, to establish a violation of the Analogue Act, the government must prove the following elements:

> (1) substantial chemical similarity between the alleged analogue and a controlled substance; (2) actual, intended, or claimed physiological similarity (in other words, that the alleged analogue has effects similar to those of a controlled substance or that the defendant intended or represented that the substance would have such effects); and (3) intent that the substance be consumed by humans.

*United States v. Carlson*, 810 F.3d 544, 550 (8th Cir. 2016).

The substances charged in this case are XLR-11 and AM2201. *See* Supers'g Indict. (ECF No. 56) ¶¶ 10, 45–57.  Prior to July 9, 2012, AM2201 is alleged as an analogue of JWH-018, a Schedule I controlled substance, and controlled substance itself thereafter. *Id.*  XLR-11 is only

1    charged as an analogue of JWH-018.

2        The DEA issued a notice of intent to temporarily schedule JWH-018 in November 2010.

3    *See* Schedules of Controlled Substances: Temporary Placement of Five Synthetic Cannabinoids

4    Into Schedule I, 75 Fed. Reg. 226 (Nov. 24, 2010).  A final order of temporary scheduling was

5    issued for JWH-018 in March 2011.  *See* Schedules of Controlled Substances: Temporary

6    Placement of Five Synthetic Cannabinoids Into Schedule I, 76 Fed. Reg. 11075 (Mar. 1, 2011).

7    The Synthetic Drug Abuse Prevention Act of 2012 ("SDAPA"), Pub. L. No. 112–144, Title XI,

8    Subtitle D, was signed into law and became effective on July 9, 2012.  *See* Establishment of Drug

9    Codes for 26 Substances, 78 Fed. Reg. 664 (Jan. 4, 2013) (codified at 21 C.F.R. § 1308(d)).[8]  As

10   part of the SDAPA, 26 new substances were permanently listed as Schedule I controlled

11   substances, including JWH-018 and AM2201.  *Id.*  Eight of the 26 new Schedule I controlled

12   substances were covered by temporary scheduling final orders prior to July 9, 2012.  *Id.*

13       The DEA issued a notice of intent to temporarily schedule XLR-11 in April 2013.  *See*

14   Schedules of Controlled Substances: Temporary Placement of Three Synthetic Cannabinoids Into

15   Schedule I, 78 Fed. Reg. 21858 (Apr. 12, 2013).  A final order of temporary scheduling was issued

16   for XLR-11 in May 2013.  *See* Schedules of Controlled Substances: Temporary Placement of

17   Three Synthetic Cannabinoids Into Schedule I, 78 Fed. Reg. 28735 (May 16, 2013).  In May 2016,

18   the DEA issued a final rule permanently listing XLR-11 into Schedule I.  *See* Schedules of

19   Controlled Substances: Placement of UR-144, XLR11, and AKB48 into Schedule I, 81 Fed. Reg.

20   29142 (May 11, 2016) (codified at 21 C.F.R. § 1308.11(d)).

21
22                  i.  *Federal Law Does Not Preclude Prosecution of a Substance as an*
                        *Analogue of a Temporarily Scheduled Substance*

23       Mr. Galecki's motion argues that the analogue counts must be dismissed because, as a

24   matter of law, a substance cannot be an analogue of a temporarily scheduled substance.  Mot. at

25   31–32.  He claims there is no express statutory authority allowing the prosecution of an alleged

26   _____

27   [8] As the title "Establishment of Drug Codes for 26 Substances" describes, this publication provided notice
     of the DEA's final rule establishing drug codes for the 26 permanent additions to Schedule I and making
     technical and conforming amendments in accordance with SDAPA.  The publication expressly states that

28   the SDAPA became effective on July 9, 2012, while the DEA's final rule was effective January 4, 2013.

1    analogue of a temporarily scheduled substance. "If the government can rapidly classify substances

2    as 'temporarily' banned, and then allege that another substance is an 'analogue' of the temporarily

3    banned substance, then there would essentially be no need for the government to comply with the

4    detailed procedural requirements of having a substance become 'permanently' scheduled." Reply

5    at 13–14. Thus, Galecki contends that dismissal is required.

6        The government's Response asserts that the CSA's temporary scheduling provisions were

7    enacted precisely for the situation that occurred in this case. JWH-018 was listed as a temporary

8    controlled substance on March 1, 2011, but not permanently scheduled until July 9, 2012. The

9    Supreme Court acknowledged in *Touby* that Congress amended the CSA to create an expedited

10   procedure to temporarily schedule a substance "when doing so is necessary to avoid an imminent

11   hazard to public safety." 500 U.S. at 163. The regimented process required to permanently

12   schedule a substance results in lengthy delays, which drug traffickers exploit by making drugs with

13   similar pharmacological effect to scheduled substances but a slightly different chemical

14   composition so that existing schedules do not apply to them. *Touby*, 500 U.S. at 163; *Kelly*, 874

15   F.3d at 1042–44. Galecki's assertion is contrary to the recognized public policy and purpose of

16   the statute.

17       Mr. Galecki's argument belies the plain language of the Analogue Act as well as its stated

18   purpose and public policy. The statute comprises a single sentence: "A controlled substance

19   analogue shall, to the extent intended for human consumption, *be treated, for the purposes of any*

20   *Federal law as a controlled substance in schedule I.*" 21 U.S.C. § 813 (emphasis added). The

21   plain language of the statute does not place a limitation or qualification as to the scheduling

22   procedure used by the DEA for the underlying controlled substance. As the Supreme Court

23   recognized in *McFadden*, the Analogue Act instructs courts to treat analogues intended for human

24   consumption "as controlled substances listed on schedule I for purposes of federal law." 135 S. Ct.

25   at 2302 (citing 21 U.S.C. § 813). *McFadden* forecloses Galecki's argument and, if accepted,

26   would thwart the very purpose of the Analogue Act.

27   / / /

28   / / /

13

1

*ii.  Federal Law Does Not Prohibit Prosecution of a Substance as Both a*
*Controlled Substance and an Analogue*

2   Galecki asserts that the Analogue Act's defining provision, 21 U.S.C. § 802(32)(c)(i),

3   precludes prosecution of a substance as both a controlled substance and an analogue.  Mot. at 32–

4   33.  The statutory language defining the term "controlled substance analogue" expressly states that

5   an analogue "does not include a controlled substance."  *Id.*  As such, Galecki contends that a

6   defendant charged in connection with AM-2201 or XLR-11 would be charged with controlled

7   substance offenses, not analogue offenses.  Thus, the controlled substance counts must be

8   dismissed as a matter of law.

9   In response, the government maintains that nothing in the Analogue Act, or any other

10  provision of the CSA, prevents the government from prosecuting a defendant for both the

11  distribution of an analogue and later distribution of that same substance as a controlled substance

12  itself.

13  Galecki provides no legal authority to support his argument.  The plain language of the

14  statute does not preclude a substance from prosecution as both an analogue and a controlled

15  substance for criminal conduct involving different time periods.  Although § 802(32)(c)(i) states

16  that an analogue "does not include not a controlled substance," this provision no longer applies

17  once the substance is subject to an order of temporary or permanent scheduling.  The Superseding

18  Indictment alleges that AM2201 was an analogue *prior* to July 9, 2012; and *after* July 9, 2012,

19  AM2201 is a Schedule I controlled substance.  Counts Twenty, Twenty-One, and Twenty-Five

20  track these time frames.  Thus, AM2201 is not charged as both an analogue and a controlled

21  substance *at the same time*.  Galecki's position rests on an inaccurate reading of the allegations in

22  this case.  Furthermore, XLR-11 is not charged as a controlled substance in this case; thus, his

23  arguments regarding its date of temporary scheduling are inapplicable.  The court finds no defect

24  in the pleading under § 802(32)(c)(i).

25

26

*iii. The SDAPA and the Analogue Act are Not Void for Vagueness as*
*Applied to AM-2201 and XLR-11*

27  The Due Process Clause of the Fifth Amendment provides that no person shall be deprived

28  of life, liberty, or property, without due process of law.  U.S. Const. amend. V; *see also Valenzuela*

14

1    *Gallardo v. Lynch*, 818 F.3d 808, 819 (9th Cir. 2016) (quoting *Johnson v. United States*, 135 S. Ct.

2    2551, 2556 (2015)).  The Due Process Clause requires that a criminal law provide the kind of

3    notice that will enable ordinary people to understand what the law prohibits.  *Id.*  For statutes

4    involving criminal sanctions, "the requirement for clarity is enhanced."  *United States v. Harris*,

5    705 F.3d 929, 932 (9th Cir. 2013) (quoting *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th

6    Cir. 2009)).  "The prohibition of vagueness in criminal statutes is a well-recognized requirement,

7    consonant alike with ordinary notions of fair play and the settled rules of law, and a statute that

8    flouts it violates the first essential of due process."  *Valenzuela Gallardo*, 818 F.3d at 819 (quoting

9    *Johnson*, 135 S. Ct. at 2556–57) (internal bracketing omitted).  However, "perfect clarity and

10    precise guidance have never been required even of regulations that restrict expressive activity."

11    *United States v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Ward v. Rock Against Racism*, 491

12    U.S. 781, 794 (1989)).

13         A criminal statute is unconstitutionally vague "if it is not sufficiently clear to provide

14    guidance to citizens concerning how they can avoid violating it and to provide authorities with

15    principles governing enforcement."  *United States v. Chhun*, 744 F.3d 1110, 1117 (9th Cir. 2014)

16    (quoting *Harris*, 705 F.3d at 932).  The Ninth Circuit has recognized three reasons for invalidating

17    vague statutes: "(1) to avoid punishing people for behavior that they could not have known was

18    illegal; (2) to avoid subjective enforcement of laws based on arbitrary and discriminatory

19    enforcement by government officers; and (3) to avoid any chilling effect on the exercise of First

20    Amendment freedoms."  *United States v. Osinger*, 753 F.3d 939, 945 (9th Cir. 2014) (quoting

21    *Kilbride*, 584 F.3d at 1256).

22         Galecki asserts that defendants are being prosecuted for events that predate the DEA's

23    published rules and press releases.  Mot. at 28–29.  He argues this amounts to a due process

24    violation.  Galecki asserts that the effective date of the SDAPA has been a source of confusion

25    because a DEA press release, published rule, related legislation, and an internet positing on a law

26    review website each referenced different effective dates.  Mot. at 29 (citing Ex. 18 (ECF No. 171-

27    18), John Parr, *The Synthetic Drug Abuse Prevention Act: There's Still Heavy Lifting to Do*

28    *Hurdles in Prosecuting Synthetic Drug Cases*, Ohio St. J. Crim. L.; Ex. 19 (ECF No. 171-19),

Establishment of Drug Codes for 26 Substances, 78 Fed. Reg. 664 (Jan. 4, 2013)).  In addition, a May 16, 2013 DEA press release stated effective immediately XLR-11 would be a Schedule I illegal drug.  Mot. Ex. 20 (ECF No. 171-20).  The press release further stated that the "DEA published a notice of its intent to do this and issued a press release about it on April 12, *giving makers, sellers, and other possessors of these drugs a month to rid themselves of their current stocks and to cease making or buying more*." *Id*. (emphasis added).  Because defendants' charged conduct predates the DEA's published rules and press releases, he reasons the SDAPA and Analogue Act is void for vagueness and the court must apply the rule of lenity.

In response, the government states that there is no ambiguity in the effective dates of the applicable statutes.  AM-2201 became a controlled substance on July 9, 2012.  Thus, the Superseding Indictment appropriately alleges that prior to July 9, 2012, AM2201 was an analogue of JWH-018; and after July 9, 2012, AM2201 is a Schedule I controlled substance.  AM2201 is charged as a controlled substance analogue because it was intended for human consumption and met the definitional elements of an analogue of JWH-018, which has been a Schedule I controlled substance since March 1, 2011.

None of the examples Galecki cites create ambiguity in the SDAPA or the Analogue Act.  At least two other district courts, including one in this district, have rejected this argument.[9]  "It is well established that, absent a clear direction by Congress to the contrary, a law takes effect on the date of its enactment."  *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991).  The SDAPA was signed into law on July 9, 2012.  A DEA final rule titled, "Establishment of Drug Codes for 26 Substances," notes that the SDAPA became effective on July 9, 2012.  78 Fed. Reg. 664 (Jan. 4, 2013).  Galecki cites the effective date of the *final rule*, January 4, 2013, as an example of a source of confusion.  The final rule clearly distinguishes the effective date of the SDAPA from that of the rule itself and does not render the SDAPA's effective date ambiguous.

---

[9]  *United States v. Riley*, No. 2:12-cr-00478-JAD-VCF, 2014 WL 537013, at *4 (D. Nev. Feb. 7, 2014) (noting that the SDAPA became effective on July 9, 2012, as a matter of law); *United States v. Carlson*, No. 12-cr-305-DSD-LIB, 2013 WL 5125434, at *21 (D. Minn. Sept. 12, 2013) (finding that the mistaken effective date of the SDAPA published by former Assistant U.S. Attorney Parr is not "evidence sufficient for a court to invalidate a statute duly passed by Congress and signed into law by the President").

Mr. Galecki has not shown how the DEA's May 16, 2013 press release make the SDAPA's effective date ambiguous or the Analogue Act void for vagueness. The press release announced the temporary scheduling of XLR-11. *See* Schedules of Controlled Substances: Temporary Placement of Three Synthetic Cannabinoids Into Schedule I, 78 Fed. Reg. 28735 (May 16, 2013). The press release made no reference to the SDAPA, its effective date, the Analogue Act, JWH-018, or AM2201. The DEA issued a final order of temporary scheduling for JWH-018 on March 1, 2011. 76 Fed. Reg. 11075. The conduct charged in this case allegedly occurred from March 2012 to August 2012. Taking the allegations in the Superseding Indictment as true, XLR-11 was an analogue as defined by the Analogue Act during the time frame alleged in the Superseding Indictment.

Galecki's motion further argues that the Analogue Act and its defining provision, 21 U.S.C. § 832(32)(A), are void for vagueness as applied to AM-2201 and XLR-11 because the statutes fail to establish an ascertainable standard of guilt or provide sufficient minimal standards to guide law enforcement officers. Mot. 33–35 (citing *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921); *City of Chicago v. Morales*, 527 U.S. 41, 72 (1999)). The DEA is using "administrative alchemy" to prosecute defendants for acts that occurred before July 9, 2012, because the materials were not banned until arguably that date. Mot. at 34.[10] Accordingly, Counts Twenty-Two, Twenty-Three, Twenty-Four, Twenty-Five, and Twenty-Six must be dismissed.

In response, the government asserts there is no requirement that an analogue be published in the Federal Register, officially scheduled, or be otherwise publically identified. Galecki's argument ignores the purpose of the Analogue Act because one of the statute's aims is to deter and

---

[10]  Galecki also contends that AM-2201 and XLR-11 were not analogues of JWH-018; thus, it is clear the CSA is being unconstitutionally applied to him regarding XLR-11. Mot. at 34 (citing *The Smoke Shop, LLC v. United States*, 949 F. Supp. 2d 877, 879 (E.D. Wis. 2013) (denying The Smoke Shop's petition for return of property, and stating in dicta, "the overwhelming weight of opinion in the scientific community is that the chemical structures of UR–144 and XLR–11 are not substantially similar to the chemical structure of JWH–018 …"). Whether a particular substance is a "controlled substance analogue" is not a preliminary factual finding necessary to decide a question of law presented by a pretrial motion. To the extent Galecki challenges whether AM-2201 and XLR-11 were analogues of JWH-018, that is a fact issue that must be left for the jury at trial on the merits. *See, e.g.*, *United States v. Bamberg*, 478 F.3d 934, 939 (8th Cir. 2007); *United States v. Brown*, 415 F.3d 1257, 1264 (11th Cir. 2005); *United States v. Johnson*, No. 2:13-cr-00395-GMN-GWF, 2014 WL 7330935, at *4 (D. Nev. July 31, 2014) (collecting cases).

criminalize abusive drugs that resemble controlled substances before they are formally identified and listed as a controlled substance by the DEA or Congress. Resp. at 8–9 (citing *United States v. Washam*, 312 F.3d 926, 933 (8th Cir. 2002) ("One of Congress' purposes for passing the Analogue Statute was to prohibit innovative drugs."); *United States v. Roberts*, 363 F.3d 118, 126 (2d Cir. 2004) (noting that the "wording of the Act evinces a clear congressional intent not to limit its scope" to designer drugs).

The Supreme Court and multiple court of appeals have repeatedly held that the Analogue Act is not void for vagueness. *E.g.*, *McFadden*, 135 S. Ct. at 2306–07 (finding the Analogue Act "unambiguous"); *United States v. Carlson*, 810 F.3d 544 (8th Cir. 2016); *United States v. Berger*, 553 F.3d 1107 (8th Cir. 2009); *United States v. Bamberg*, 478 F.3d 934, 937 (8th Cir. 2007); *United States v. Turcotte*, 405 F.3d 515 (7th Cir. 2005) ("The circuit courts considering this issue have unanimously held that the CSA's Analogue Provision is not unconstitutionally vague."); *United States v. Ansaldi*, 372 F.3d 118 (2d Cir. 2004); *United States v. Klecker*, 348 F.3d 69 (4th Cir. 2003); *United States v. Fisher*, 289 F.3d 1329 (11th Cir. 2002); *United States v. Hofstatter*, 8 F.3d 316 (6th Cir. 1993); *United States v. Raymer*, 941 F.2d 1031 (10th Cir. 1991); *United States v. Granberry*, 916 F.2d 1008 (5th Cir. 1990). Although this issue has yet to be addressed in a published opinion, a Ninth Circuit panel has held that the Analogue Act is not unconstitutionally vague. *United States v. Lane*, 616 Fed. App'x. 328, 329 (9th Cir. 2015) (affirming Analogue Act convictions for MDPV, a-PVP, and a-PBP). The panel held that *McFadden*'s scienter requirement was satisfied because the district court required the government to prove the defendant "knew he was dealing with controlled substance analogues." *Id.* (citing *McFadden*, 135 S. Ct. at 2307). Additionally, at least five judges in this district have concluded that the Analogue Act is not void for vagueness. *E.g.*, *United States v. Flaherty*, No. 2:16-cr-00080-APG-NJK, 2018 WL 1417216, at *2 (D. Nev. Feb. 2, 2018) (rejecting vagueness challenge as to 5F-AKB48), *report & recommendation adopted*, 2018 WL 1413970 (D. Nev. Mar. 21, 2018); *United States v. Johnson*, No. 2:13-cr-00395-GMN-GWF, 2014 WL 7330935, at *1 (D. Nev. July 31, 2014) (rejecting vagueness challenge as to XLR-11 and 5F-PB-22), *report & recommendation adopted*, 2014 WL 7330936 (D. Nev. Dec. 19, 2014); *United States v. Riley*, 2:12-cr-00478-JAD-VCF (D. Nev.) Feb.

1    7, 2014 R & R (ECF No. 184) (rejecting vagueness challenge as to AM2201, XLR-11).[11]

2    The court finds that the Analogue Act is not void for vagueness as applied to AM-2201

3    and XLR-11.  The government correctly points out that the Analogue Act does not require public

4    identification of an analogue to authorize criminal sanctions.  The reason is simple.  The DEA

5    publicly identifies all Schedule I controlled substances.  The plain language of the Analogue Act

6    itself provides notice that any substance that is intended for human consumption and has

7    substantially similar effects to listed substances will be treated as Schedule I substances.  Thus,

8    the listing of the underlying controlled substance along with the Analogue Act itself provides

9    constitutionally adequate notice.  *See Washam*, 312 F.3d at 931; *Fisher*, 289 F.3d at 1336.  The

10   Analogue Act's limitation to substances "intended for human consumption" that mimic the effects

11   of controlled substances provides sufficient minimal standards to guide law enforcement officers

12   and protect against possible arbitrary enforcement.  *See Roberts*, 363 F.3d at 126.  Additionally,

13   the statute establishes an ascertainable standard of guilt.  *McFadden*, 135 S. Ct. at 2306–07

14   (finding that the scienter requirement "alleviates vagueness concerns, narrows the scope of the its

15   prohibition, and limits prosecutorial discretion") (quoting *Gonzales v. Carhart*, 550 U.S. 124, 149

16   (2007) (internal brackets and quotation marks omitted)).  Galecki's vagueness challenge as applied

17   to AM-2201 and XLR-11 lacks merit.

18       *iv.  Whether Counts 20, 21, and 25 Must be Dismissed Because AM-2201*
         *was not a Controlled Substance for a Substantial Part of the Alleged*
19       *Conspiracy*

20   Galecki contends that AM-2201 was not a Schedule I substance during the majority of the

21   time alleged in Counts Twenty, Twenty-One, and Twenty-Five.  Mot. at 35–36.  The Superseding

22   Indictment alleges the following time frames regarding AM2201: Count Twenty – in or about

23   March to August 2012; and Counts Twenty-One and Twenty-Five – on or about May 28 to July

24   25, 2012.  However, AM2201 was not signed into law as a Schedule I substance until July 9, 2012.

25   As such, the motion asserts that a conviction on these counts would violate the ex post facto clause

26   of the United States Constitution.  Galecki claims Counts Twenty, Twenty-One, and Twenty-Five

27   must be dismissed based on this fatal flaw.

28   _____
     [11]  The magistrate judge's report and recommendation was denied as moot upon defendants' change of plea.

In response, the government argues that Counts Twenty, Twenty-One, and Twenty-Five are properly charged under the Analogue Act and the CSA. The Analogue Act expressly states that an analogue is treated "as a controlled substance in schedule I" when it is marketed and produced for human consumption, and it is prosecuted as such under 21 U.S.C. § 841(a)(1) of the CSA. JWH-018 became a Schedule I controlled substance on March 1, 2011. AM2201 is charged as a Schedule I controlled substance after July 9, 2012, and prior to that date, as an analogue of JWH-018. Once a substance is scheduled, as AM2201 was on July 9, 2012, it is no longer an analogue. Because AM2201 was listed on that date, it was no longer an analogue of JWH-018. The government maintains that the charging document is correctly pleaded.

As explained, the Superseding Indictment appropriately distinguishes the dates AM2201 is charged as an analogue and as a controlled substance.

### 3. Ground Three – Failure to State a Mail or Wire Fraud Offense

The motion argues that the court should dismiss the mail and wire fraud and conspiracy charges, Counts Nine through Nineteen, based on a failure to state an offense. Mot. at 36–39. The government alleges that certain letters and text messages exchanged between the alleged co-conspirators constitute mail and wire fraud. Galecki contends, however, that the communications as pled cannot form substantive and conspiracy wire and mail fraud charges because no "property rights" were violated and there are no alleged "victims." In other words, no alleged victims claim they were defrauded when they bought the substances at issue. A person who purchased a product with the intent to get "high" would not be defrauded by a label stating "not for human consumption" because the packages informed people *not* to ingest the product. Quoting *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014), Galecki asserts that the fraud statutes do not cover a " 'right to accurate information before making an otherwise fair exchange'." Mot. at 38 (quoting *Sadler*, 750 F.3d at 591) (citing *United States v. Jackson*, 2017 WL 1129941, at *2 (N.D. W. Va. Mar. 24, 2017) (noting that "mail fraud does not punish mere deceit of another person or entity"). The government alleges that people purchased defendants' spice products to ingest them and defendants manufactured the products for this purpose. Taking this allegation as true, a purchaser who bought the product with that intent would not be defrauded. "They would be purchasing the

1   product for that purpose." Reply at 4. Because the charges fail to allege that anyone's property

2   rights have been violated, the court should summarily dismiss Counts Nine through Nineteen.

3        The government's responds that the Superseding Indictment provides sufficient details of

4   the mailings on which the mail fraud counts are based, and the wire communications on which the

5   wire fraud counts are based. *See* Supers'g Indict. ¶¶ 34, 43. Counts Nine through Nineteen allege

6   that Galecki made materially false and fraudulent statements that Zencense manufactured and

7   distributed "herbal incense," "potpourri," and "aromatherapy" not for human consumption, to

8   conceal that they were in fact spice products intended for human consumption. *Id*. ¶¶ 26–43. The

9   Superseding Indictment explicitly alleges "the conspiracy to defraud was executed for the purpose

10  of obtaining money from others, those others being the victims, and the money they were

11  fraudulently induced to give Zencense for their intentionally mislabeled products being the

12  property." Resp. at 12; *see also* Supers'g Indict ¶¶ 28, 37. Galecki's reliance on *Sadler* is

13  misplaced. There, the Sixth Circuit addressed the sufficiency of evidence presented at trial to

14  uphold the defendant's fraud convictions, not the sufficiency of the charging documents or

15  language necessary in fraud indictments.[12] The four corners of the Superseding Indictment

16  sufficiently address each element of the charged offenses and give defendants notice of the crimes

17  charged with specificity. Therefore, Galecki's motion should be denied as to Ground Three.

18       "The elements of mail fraud and wire fraud are essentially identical: the government must

19  show (1) a scheme to defraud, (2) the use of either the mail or wire, radio, or television to further

20  the scheme, and (3) the specific intent to defraud." *United States v. Brugnara*, 856 F.3d 1198,

21  1207 (9th Cir. 2017) (citing *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013) (wire fraud);

22  *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003) (mail fraud)). However, mail fraud

---

[12]  The government's position is well-taken. A recent unpublished decision in the Fifth Circuit upheld convictions for conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349 where the defendants devised a scheme and artifice to defraud customers and the general public by marketing and distributing misbranded drugs. *United States v. Bays*, 680 F. App'x 303, 311 (5th Cir.), *cert. denied*, 137 S. Ct. 2176 (2017). Similar to Galecki's current argument, the appellant argued that no one was defrauded because all of the customers and consumers were "in on the joke, so to speak...." *Id*. However, the Fifth Circuit held that record evidence supported a finding that some customers relied on false representations that the product was "not intended for human consumption" or was "D.E.A. and state compliant," and such "statements plainly have a natural tendency to influence" purchasers' decisions. *Id*. Galecki's argument are questions of fact for the jury.

also requires the element of materiality.  *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003).  The first element covers 'any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises'."  *Brugnara*, 856 F.3d at 1207–08 (quoting *Carpenter v. United States*, 484 U.S. 19, 27 (1987); *see also Cleveland v. United States*, 531 U.S. 12, 25–26 (2000).[13]

Here, the Superseding Indictment conforms to minimum constitutional standards by pleading each essential element of the mail fraud and wire fraud charges.  Counts Nine through Nineteen track the language of the statutes charging the offenses, 18 U.S.C. §§ 1341 and 1343, and provide additional allegations that fairly inform the defendants of the fraud charges they must defend against.  *Resendiz-Ponce*, 549 U.S. at 108–09; *Hamling*, 418 U.S. at 117; *Givens*, 767 F.2d at 584.  For example, Ritchie and Galecki allegedly made materially false statements that Zencense manufactured and distributed "herbal incense," "potpourri," and "aromatherapy" not for human consumption, concealing what they knew were spice products for human consumption."  Supers'g Indict. ¶¶ 29, 33, 39, 42.  They purportedly used and caused to be used the mails and wire communications, such as text and electronic mail messages, to execute their scheme and artifice to defraud.  *Id*. ¶¶ 30, 34, 39, 43.  The Superseding Indictment is sufficient on its face.

*Sadler* and inapplicable here.  In *Sadler*, the defendant lied to pharmaceutical distributors when she ordered pills for her make-believe clinic by falsely telling the distributors the drugs were being used to for indigent patients.  750 F.3d at 590.  The Sixth Circuit found that the government never proved that Sadler intended to deprive anyone of property.  Rather, she paid the going rate for the pills.  The Sixth Circuit rejected the government's argument that her lies convinced distributors to sell pills that they would not have sold her had they known the truth, *i.e.*, a deprivation of "a right to accurate information."  *Id*. at 590–91.  Here, the fraud counts allege that the scheme to defraud was executed for the purpose of obtaining money from others.  Supers'g Indict. ¶¶ 28, 37.  Individuals who were allegedly defrauded by Zencense were deprived of their money because Zencense intentionally mislabeled its products in violation of 18 U.S.C. §§ 1341

---

[13]  Both 18 U.S.C. §§ 1341 and 1343 use the disjunctive language "money *or* property."  *Id*. (emphasis added).  Any conjunctive interpretation of this phrase is duplicative since money is also viewed as property.

and 1343.  In contrast, the pharmaceutical distributors in *Sadler* received money for their pills and were only deprived of an "ethereal right to accurate information."  750 F.3d at 591.

*Jackson* also misses the mark.  In *Jackson*, the defendants were charged with mail fraud for making materially false statements that they operated a bonifide charitable organization when, in fact it was never a charity and they kept more than 90% of the profit from the bingo and raffle games.  2017 WL 1129941, at *8.  The district court dismissed the mail fraud counts for failure to adequately allege a scheme or artifice to defraud because the alleged victims did not have "*a property right*, as recognized by § 1341, to the truth."  *Id*. *9 (emphasis added).  As explained, the Superseding Indictment alleges the defendants executed a scheme to defraud for the purpose of obtaining *money* from their victims.  This case does not involve an abstract property right in the truth or accurate information.  The fraud charges are therefore sufficient on their face.

### 4.   Ground Four – Continuing Criminal Enterprise Count and the Five Person Requirement

Mr. Galecki's motion asks the court to dismiss Count One charging him with operating a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848, because the government cannot establish the statute's requirements that a defendant (i) act in concert with five or more persons, and (ii) have managerial responsibility over those people, not just a business relationship.  Mot. at 39–40 (citing *United States v. Jerome*, 942 F.2d 1328, 1331 (9th Cir. 1991); *United States v. Delgado*, 4 F.3d 780, 783–88 (9th Cir. 1993).  Here, only three people are charged in the CCE count: Galecki, Ritchie, and Eaton.  Thus, the government has not properly pled or established the five-person requirement and the court should dismiss the CCE count as a matter of law.

In response, the government states that Galecki's motion improperly questions the government's ability to establish each element of the CCE count.  This is a question of fact that must be resolved by the jury, not a question of law to be resolved by the court on a pretrial motion.

To prove that a defendant engaged in a CCE under 21 U.S.C. § 848, the government must factually establish:

> (1) that the defendant's conduct constituted a felony violation of federal narcotics law; (2) that the described conduct occurred as part of a continuing series of violations of federal narcotics law; (3) that the defendant undertook the activity in

23

concert with five or more persons; (4) that the defendant acted as the organizer, supervisor, or manager of the criminal enterprise; and (5) that the defendant obtained substantial income or resources from the purported enterprise.

*United States v. Ziskin*, 360 F.3d 934, 948 (9th Cir. 2003) (quoting *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1570 (9th Cir. 1989)).  With regard to the second element, the Ninth Circuit has interpreted the term "continuing series" to require that the government prove the defendant committed three or more federal narcotics violations.  *Id*.

To be an organizer, manager, or supervisor in a continuing criminal enterprise, a defendant must exercise some sort of managerial responsibility, not just engage in a business relationship, though he need not necessarily be able to control those whom he organizes, nor be the "ringleader" of the organization.  *United States v. Otis*, 127 F.3d 829, 834 (9th Cir. 1997) (citation omitted). The Ninth Circuit has held that "the government need not prove that the organizer of the enterprise worked with five people at the same time during the continuing series of violations."  *United States v. Garcia*, 988 F.2d 965, 968 (9th Cir. 1993).

Count One tracks the words of the CCE statute:

From in or about March 2012, to in or about August 2012, within the District of Nevada, and elsewhere, [Ritchie and Galecki] did intentionally and knowingly engage in a continuing criminal enterprise in that they intentionally and knowingly violated [21 U.S.C. §§] 841(a)(l), (b)(l)(C), and 856(a)(l), which violations include, but are not limited to, the substantive violation[s] alleged in [Counts 21, 23, 24, 25, 26], which Counts and Overt Acts set forth in those Counts are realleged and incorporated herein by reference as if fully set forth in this Count, and which violations were part of a continuing series of violations of the Controlled Substances Act, [21 U.S.C. §] 801, et seq., undertaken by defendants Ritchie and Galecki *in concert with at least five other persons* with respect to whom defendants Ritchie and Galecki occupied positions of organizer, supervisor, and any position of management, and from which such continuing series of violations the defendants obtained substantial income and resources; all in violation of 21 U.S.C. § 848.

Supers'g Indict. at ¶ 17 (emphasis added).  This count alleges (i) a felony violation of federal narcotics law, (ii) conduct that allegedly occurred as part of a continuing series of federal narcotics violations, *i.e.*, the substantive violations alleged in Counts Twenty-One, Twenty-Three, Twenty-Four, Twenty-Five, and Twenty-Six, (iii) Ritchie and Galecki acted in "*in concert with at least five other persons*" with (iv) respect to whom they occupied positions of organizer, supervisor, and any position of management, and (v) defendants obtained substantial income and resources from the enterprise.  Galecki cites no legal authority to support his assertion that the government

is required to name the five subordinate persons in the indictment.  In determining whether a cognizable offense has been charged, the court does not consider whether the government can *prove* its case, only whether accepting the facts as alleged in the indictment as true, a crime has been alleged. *Milovanovic*, 678 F.3d at 717.  Galecki's argument attempts to challenge a facially-sufficient indictment on the ground that the allegations are not supported by adequate evidence. *Jensen*, 93 F.3d at 669.  The CCE count is adequately pled.

### 5. Ground Five – Financial and Money Laundering Counts

Based on Ground Two's arguments that the controlled substance and analogue charges should be dismissed, Galecki asserts that the financial and money laundering counts related to those charges should also be dismissed.  Mot. at 41.

The government points out that Galecki's argument is premised on the court making a premature finding of fact as to one of the central issues of this case: whether the products defendants manufactured for human consumption qualify as analogues.  Because this is a fact question for the jury to decide, the court should deny the motion as to ground five.

The court has rejected Galecki's arguments that the controlled substance and analogue charges should be dismissed.  Accordingly, dismissal is not warranted for the financial and money laundering counts.

## CONCLUSION

When read as a whole to include the facts necessarily implied and construed according to common sense, and accepting the factual allegation as true, the court finds that the Superseding Indictment complies with Rule 7's requirements.  Fed. R. Crim. P. 7(c)(1) (indictment "must be a plain, concise and definite written statement of the essential facts constituting the offense charged").

/ / /

/ / /

/ / /

/ / /

/ / /

25

For the reasons explained,

**IT IS ORDERED:**

1.  Co-defendants Charles Burton Ritchie and Ryan Matthew Eaton's Motions for Joinder (ECF Nos. 162, 163) are **DENIED as moot**.

2.  Ritchie and Eaton's Motions for Joinder (ECF Nos. 173, 177) are **GRANTED** as to their request to join in the substantive arguments.

**IT IS RECOMMENDED:** Benjamin Galecki's Motion to Dismiss (ECF No. 171) be **DENIED**.

Dated this 15th day of June, 2018.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE