|  | |
|---|---|
| 1 | **UNITED STATES DISTRICT COURT** |
| 2 | **DISTRICT OF NEVADA** |

| | | |
|---|---|---|
| 3 | UNITED STATES OF AMERICA, | |
| 4 | Plaintiff, | Case No.: 2:15-cr-0285-APG-EJY |
| 5 | v. | **Order Regarding Sentencing Guideline Calculation** |
| 6 | CHARLES BURTON RITCHIE, BENJAMIN GALECKI, | |
| 7 | Defendants. | |

The defendants were convicted of 24 crimes related to their manufacture of synthetic cannabinoids. Their manufacturing process produced damiana leaves infused with the chemical XLR-11. In order to calculate the Sentencing Guideline range, I must determine the base offense level specified in the Drug Quantity Table of guideline § 2D1.1. The Government and the defendants disagree as to how I should make that determination. They also disagree whether the defendants' sentences should be increased under guideline § 5K2.1, which allows for an increased sentence if death resulted from the defendants' activities. The parties briefed these issues and I conducted an evidentiary hearing.

**Section 2D1.1**

Preliminarily, there appears to be a dispute as to the amount of synthetic cannabinoid that the defendants should be sentenced for. The Government seized 7.95 kg[1] of pure XLR-11 and 55.68 kg of finished product. *See* PSR ¶ 13. But the PSR states that the defendants are responsible for 800 kg of synthetic cannabinoids, based on the

---

[1] Defendant Ritchie's memorandum refers to only .946 kg of pure XLR-11. *See* ECF No. 477 at 2.

defendants' admissions, the statements of co-defendant Eaton, and shipping records and weights of product shipped from Nevada to Florida. *Id.* at ¶ 17. The parties should address in their sentencing memoranda what amount I should use to calculate the offense level.

The defendants committed their crimes in 2012 and were convicted in 2019.

> In general, the district court must apply the version of the Guidelines which is in effect on the date of sentencing. . . . However, if use of those Guidelines would violate the Ex Post Facto Clause, the defendant must be sentenced, instead, under the version of the Guidelines that was in effect when he committed his offense.

*United States v. Johns*, 5 F.3d 1267, 1269 (9th Cir. 1993). The Government contends the defendants should be sentenced under the 2018 version of the Sentencing Guidelines. The defendants argue they should be sentenced under whichever version of the guidelines is most favorable to them.

The Drug Conversion Tables of § 2D1.1 in the 2018 version of the Sentencing Guidelines list a 1:167 conversion ratio for synthetic cannabinoids, the same as for THC. *See* 2018 Guidelines Manual at p. 160. The 2012 version of the Sentencing Guidelines did not list synthetic cannabinoids in the Drug Equivalency Tables of § 2D1.1. Rather, comment 6 to that version of § 2D1.1 directed judges to "determine the base offense level using the marihuana equivalency of the most closely related controlled substance referenced in [the] guideline" based on (1) chemical structure, (2) pharmacological effect, and (3) potency.[2] The Government contends that those factors point to THC as the most closely related substance, which has a 1:167 ratio under the 2012 guidelines. Thus, the Government contends, whether I use the 2018 or 2012 guidelines, the conversion ratio is 1:167.

---

[2] The parties agree that similarity of chemical structure is not applicable here.

2

1    The defendants argue there is no scientific basis for the Sentencing Commission's 2018
2 determination that synthetic cannabinoids should have a 1:167 ratio. They also argue that, using
3 the factors in the 2012 version of the guidelines, the synthetic cannabinoids they manufactured
4 are most closely related to marijuana, not to THC. Thus, they argue, the appropriate ratio is
5 somewhere between 1:1 (the ratio for marijuana) and 1:7 (to approximate a substance somewhat
6 more dangerous than marijuana).
7    One of the defendants' experts, Dr. Gregory Dudley, testified that THC is the most
8 analogous substance to XLR-11. But he disagrees with the 1:167 ratio for THC. He feels the
9 appropriate ratio is 1:15 for THC and XLR-11. *See* ECF No. 508-2 at 7. However, that ratio
10 should apply only to the pure XLR-11 chemical. He believes the finished product (damiana
11 leaves infused with XLR-11) should have a 1:1 ratio because it was intended to be, and was used
12 as, a marijuana substitute.
13    The other defense expert, Dr. Anthony DeCaprio, likewise testified that marijuana is the
14 most analogous substance to damiana leaves infused with XLR-11, so I should use a 1:1 ratio.
15 He believes XLR-11 is not analogous to THC because XLR-11 has $CB_2$ receptor activity that
16 THC does not. And he feels THC should have a ratio between 1:8 and 1:25.
17    I find that THC is the most closely related substance to pure XLR-11. I will apply the
18 1:167 conversion ratio to the pure XLR-11 chemical that was seized from the defendants.
19 However, applying that ratio to the finished product creates too high of an offense level because
20 the weight of the damiana leaves that serves as the base for the XLR-11 skews the calculation
21 significantly higher. The damiana leaf is not a dangerous or controlled substance, yet it is treated
22 just like pure THC because its weight is counted when applying the 1:167 conversion ratio to the
23

entire finished product. For marijuana, the weight of the leaf is counted in determining the offense level, but at the 1:1 ratio.

The Government contends that synthetic cannabinoids are more dangerous than marijuana because they are more potent, have caused overdoses and deaths, and are marketed with the illusion that they are safe. ECF No. 473 at 4. The Government argues that such societal concerns help drive up the conversion ratio for synthetic cannabinoids. But I am not convinced that the finished product here is 167 times more dangerous than marijuana.

And as the defendants pointed out at the hearing, the Government's argument for a 1:167 ratio for the entire finished product creates a perverse result. A defendant who mixes 10 kilos of damiana leaves with 1 kilo of XLR-11 has 11 kilos of a dangerous substance. A defendant who mixes 100 kilos of damiana leaves with 1 kilo of XLR-11 has 101 kilos of a very diluted substance. Yet the second defendant (with 101 kilos) faces a more severe punishment because his concoction converts to 16,867 kilos (101 x 167) of marijuana while the first defendant's concoction (11 kilos of the far more powerful substance) converts to only 1,837 kilos (11 x 167). The Government points out that Application Note 27(E)(i) of the 2018 guideline § 2D1.1 says a downward departure may be warranted where "a synthetic cannabinoid [is] diluted with an unusually high quantity of base material." But there is no discussion or guidance about what constitutes a normal quantity of base material and what constitutes "an unusually high quantity of base material." Is 10 kilos of damiana leaves unusually high? Is 100 kilos?

For marijuana, the 1:1 conversion ratio does not vary regardless of the potency of the marijuana, even though potency varies considerably.[3] But for synthetic cannabinoids, different

---

[3] The Government's expert, Dr. Trecki, testified marijuana is usually 10-13% potent, but one Colorado smoke shop reported 28% potency. Dr. Dudley testified recreational marijuana averaged about 12% potency from 1995-2014 and now is about 18.7% potency.

4

potencies could result in different calculations under Application Note 27(E)(i). The guidelines offer no guidance on how to evaluate and account for such variances in potency. Compounding the problem, here the Government did not test the defendants' finished product to determine what amount of XLR-11 it contained. Thus, I do not know how concentrated or diluted the synthetic cannabinoid was.

Using the 2018 Sentencing Guidelines' 1:167 conversion ratio for the amount of product the Government seized (7.95 kg of pure XLR-11 and 55.68 kg of finished product)[4] yields a weight of 10,626.21 kg of marijuana, resulting in a base offense level of 34 under the 2018 guidelines.[5] Using the 1:167 conversion ratio for the 800 kg allocated in the PSR yields a weight of 133,600 kg of marijuana, resulting in a base offense level of 38 under the 2018 guidelines.[6]

The 1:167 conversion ratio is too high here because the calculation includes the weight of the damiana leaves in the finished product. Damiana leaves infused with XLR-11 are not 167 times more powerful, potent, or dangerous than marijuana. Thus, these offense levels and sentencing ranges are greater than necessary to achieve the purposes of 18 U.S.C. § 3553(a) in this case, and I would vary downward somewhat if I used the 2018 Sentencing Guidelines. *Kimbrough v. United States*, 552 U.S. 85, 110 (2007).

Using the factors in the 2012 guidelines, the pure XLR-11 would equate to THC and be converted at the 1:167 ratio. The finished product would be evaluated closer to the 1:1 ratio for marijuana. I agree with the Government that the synthetic cannabinoid manufactured in this case is more dangerous than marijuana, so a 1:1 ratio is too low. Marijuana with a potency range of

---

[4] *See* PSR ¶ 13.

[5] Under the 2012 guidelines, the base offense level would be 36.

[6] Under the 2012 guidelines, the base offense level would be 38.

5

10-28% of THC still has a ratio of 1:1. *See supra* n.2.  A conversion ratio of 1:15 for the synthetic cannabinoid here reflects that it is more dangerous than marijuana.  Thus, I find that the appropriate conversion ratio in this instance is 1:15. *Cf. United States v. Hossain*, No. 15CR14034MIDDLEBROOK, 2016 WL 70583, at *6 (S.D. Fla. Jan. 5, 2016) (finding a 1:7 ratio for synthetic cannabinoid "to be better founded than the 1:167 ratio that no one could explain, as it reflects the actual amount of THC in marijuana today.  Although I will not rewrite the Guidelines and apply this ratio for THC, this lower ratio is persuasive as to why the current Guideline range fails to provide just punishment for this offense.").

      Applying a 1:15 conversion ratio to the weight of the seized finished product (including the weight of the damiana leaves) and a 1:167 conversion ratio to the pure XLR-11 yields a conversion weight of 2,162.85 kg[7] of marijuana, resulting in a base offense level of 32 under the 2012 guidelines and 30 under the 2018 guidelines.  Applying those ratios to the 800 kg allocated in the PSR yields a weight of 13,208.4 kg[8] of marijuana, resulting in a base offense level of 36 under the 2012 guidelines and 34 under the 2018 guidelines.  Those offense levels and sentencing ranges are more in line with the purposes of 18 U.S.C. § 3553(a) in this case. *Kimbrough*, 552 U.S. at 110.

**<u>Section 5K2.1</u>**

      The Government contends that the Bizarro synthetic cannabinoid manufactured by the defendants caused the death of Karl LaDue.  Thus, the Government requests that I apply

---

[7] This is calculated as: (7.95 kg XLR-1 x 167 = 1,327.65) + (55.68 kg finished product x 15 = 835.2 kg) = 2,162.85 kg. *See* PSR ¶ 13 for those weights.

[8] This is calculated as: (7.95 kg XLR-1 x 167 = 1,327.65) + (792.05 kg finished product x 15 = 11,880.75 kg) = 13,208.4 kg. *See* PSR ¶ 17.

6

Sentencing Guideline § 5K2.1 and "increase the sentence above the authorized guideline range." The defendants deny their product caused Mr. LaDue's death.

The evidence presented at trial and the evidentiary hearing demonstrates that Mr. LaDue ingested Bizarro within a few hours before his death. But a number of factors cloud the answer to whether Bizarro caused his death, including his use of Bizarro, his pre-existing mental health struggles, his potential cessation of taking Abilify for those struggles (as he had repeatedly stated he would), his prior acts of violence, his use of marijuana (and his doctors' concerns about how that may affect him), the number of empty prescription bottles found in his room, and the fact he was tased multiple times by police officers.

Mr. LaDue's ingestion of Bizarro contributed to the chain of events leading to his death. Thus, I will consider—but I have not yet determined whether I will impose—a higher sentence under § 5K2.1 based on Mr. LaDue's death. However, the defendants did not intend to cause Mr. Ladue's death, and it does not appear they knew the full extent of the risk of death created by their synthetic cannabinoid. *See* § 5K2.1. Finally, because the Government did not prove the connection between the Bizarro and Mr. LaDue's death by clear and convincing evidence, if I increase the sentence for this reason, that increase would not be large enough to constitute "an extremely disproportionate effect on the sentence relative to the offense of conviction." *United States v Mezas de Jesus*, 217 F.3d 638, 6642 (9th Cir. 2000).

**Conclusion**

I THEREFORE FIND that the appropriate conversion ratio for purposes of Sentencing Guideline § 2D1.1 is 1:167 for the pure XLR-11, and 1:15 for the finished product (damiana leaves infused with XLR-11). The parties' sentencing memoranda should address (1) the amount of XLR-11 and finished product the defendants are responsible for (PSR ¶¶ 13, 17), (2) whether I

should use the offense levels and sentencing ranges from the 2012 or 2018 Sentencing Guidelines, and (3) whether I should increase the sentences based on Mr. LaDue's death and, if so, by how much.

I FURTHER ORDER the parties to file their respective sentencing memoranda by March 18, 2020 as agreed to at the last hearing. The sentencing hearing will resume on April 2, 2020 at 1:30 p.m.

DATED this 18th day of February, 2020.

                                    ANDREW P. GORDON
                                    UNITED STATES DISTRICT JUDGE